**Document Filed Electronically**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ASPEX EYEWEAR, INC. and | : | |
| CONTOUR OPTIK, INC., | : | Civil Action No. 07-cv-2373 (DC) (THK) |
| | : | |
| Plaintiffs, | : | District Judge Denny Chin |
| v. | : | Magistrate Judge Theodore H. Katz |
| | : | |
| CLARITI EYEWEAR, INC., | : | |
| | : | |
| Defendant. | x | **JURY DEMAND** |
| CLARITI EYEWEAR, INC., | : | |
| | : | |
| Counterclaim Plaintiff, | : | |
| v. | : | |
| | : | |
| ASPEX EYEWEAR, INC. and | : | |
| CONTOUR OPTIK, INC., | : | |
| | : | |
| Counterclaim Defendants. | x | |

# PLAINTIFFS STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXISTS A GENUINE ISSUE PRECLUDING CLARITI'S MOTION FOR SUMMARY JUDGMENT

## [REDACTED]

865514_1.DOC

In opposition to the Motion for Summary Judgment submitted by Clariti Eyewear, Inc. ("Clariti") and pursuant to Local Civil Rule 56.1 and Fed. R. Civ. P. 56, plaintiffs Aspex Eyewear, Inc. ("Aspex") and Contour Optik, Inc. ("Contour") (collectively "Plaintiffs") submit this statement pointing out the material facts as to which there exists a genuine issue of dispute precluding summary judgment in Clariti's favor.  Although Plaintiffs are not required to respond to Clariti's Statement of Undisputed Facts, Plaintiffs do so herein without prejudice in order to aid the Court in the present motion.

I.    **PLAINTIFFS RESPONSE TO CLARITI'S UNDISPUTED MATERIAL
FACTS DEMONSTRATING THAT PLAINTIFFS' CLAIMS
ARE BARRED BY ESTOPPEL AND LACHES AS A MATTER OF LAW.**

1.    Through this action, Plaintiffs Aspex Eyewear, Inc. ("Aspex") and Contour Optik, Inc. ("Contour") (collectively, Plaintiffs) accuse defendant Clariti Eyewear, Inc. ("Clariti") of infringing two patents: U.S. Patent No. 6,109,747 ("the '747 Patent"), and U.S. Patent No. RE37,545 ("the '545 Patent"). [Plaintiffs' Complaint, ¶¶ 12, 21.]

**Plaintiffs' Response**

Undisputed.

2.    In or before February, 2003, Clariti launched its AIRMAG line of eyeglass products. [Declaration of Dominique Yonemoto in Support of Clariti's Motion for Summary Judgment ("Yonemoto Decl."), ¶ 3.]

**Plaintiffs' Response**

Plaintiffs are without knowledge or information sufficient to make a determination as to whether the statements in this paragraph are true, and therefore dispute the same.

3.    Clariti's first sales of AIRMAG products occurred in February 2003, and Clariti also began using its AIRMAG trademark in connection with these products at least as early as February 2003. ["Yonemoto Decl.," ¶¶ 3-5, Ex. A (Statement of use re: AIRMAG mark), Ex. B (Clariti 2003 Price List).

**Plaintiffs' Response**

Undisputed to the extent that, in 2004, Clariti applied for and received a federal trademark registration for AIRMAG, but Plaintiffs are without knowledge or information sufficient to make a determination as to whether the remaining statements in this paragraph are true, and therefore dispute the same.

4.    On or about March 7, 2003, Aspex wrote Clariti accusing Clariti of infringing four patents, including three patents that are not at issue in this suit--U.S. Patent Nos. 5,737,054 ("the '054 Patent"), 6,012,811 ("the '811 Patent"), 6,092,896 ("the '896 Patent")--as well as the '545 Patent. [Yonemoto Decl., ¶ 6, Ex. C (March 7, 2006 letter from Aspex counsel to Clariti).]

**Plaintiffs' Response**

       Undisputed to the extent that Aspex's counsel wrote a letter to Clariti regarding Apex's rights in the '545, '054, '811 and '896 Patents and alleging that those rights covered Clariti products.

       5.     The March 7, 2003 letter did not identify what particular claims—either for the '545 Patent or any of the other patents--that Aspex believed were infringed. [Yonemoto Decl., ¶ 6, Ex. C.]

**Plaintiffs' Response**

       Undisputed.

       6.     On or about March 10, 2003, Aspex sent a letter to Clariti, accusing Clariti of infringing the '747 Patent. [Yonemoto Decl., ¶ 7, Ex. D (March 10, 2003 letter from Aspex counsel to Clariti).]

**Plaintiffs' Response**

       Undisputed to the extent that Aspex's counsel wrote a letter to Clariti regarding Apex's rights in the '747 Patent and alleging that those rights covered Clariti products.

       7.     The March 10, 2003 letter did not identify what particular claims of the '545 Patent that Aspex believed were infringed. [Yonemoto Decl., ¶ 7, Ex. D.]

**Plaintiffs' Response**

       Undisputed.

       8.     At the time Clariti received the March 7, 2003 and March 10, 2003 letters, Clariti's sales of, and investment in, the AIRMAG products was not substantial. [Yonemoto Decl., ¶ 8.]

**Plaintiffs' Response**

       Plaintiffs are without knowledge or information sufficient to make a determination as to whether the statements in this paragraph are true, including whether Clariti's investment in AIRMAG products was "not substantial" as of March 2003.  Moreover, this statement is unclear and ambiguous with respect to the term "not substantial."

9.     Clariti understood Aspex's infringement allegations in its March 7, 2003 and March 10, 2003 letters to be directed at Clariti's AIRMAG products. [Yonemoto Decl., ¶ 8.]

**Plaintiffs' Response**

Plaintiffs are without knowledge or information sufficient to make a determination as to whether the statements in this paragraph are true.

10.     Had Aspex filed a patent infringement suit against the AIRMAG products at that time, given the newness of the products and Clariti's lack of investment in them, Clariti would very likely have simply decided to stop selling the AIRMAG products and would have instead pursued other business opportunities. [Yonemoto Decl., ¶ 8.]

**Plaintiffs' Response**

Disputed.  Plaintiff sets forth in Section IV specific facts showing that there is a genuine issue for trial.

11.     On or about March 18, 2003, counsel for Clariti sent counsel for Aspex a letter, which in part stated that "[i]t is Clariti Eyewear's policy never to willfully infringe any valid enforceable patent." [Yonemoto Decl., ¶ 9, Ex. E (March 18, 2003 letter from Clariti counsel to Aspex counsel).]

**Plaintiffs' Response**

Undisputed.

12.     Clariti pointed out in paragraph 7 of its March 18 letter, "[t]here are a large number of claims. Please specify which claims you believe may cover Clariti's products by model number." [Yonemoto Decl., ¶ 9, Ex. E (March 18, 2003 letter from Clariti counsel to Aspex counsel).]

**Plaintiffs' Response**

Undisputed.

13.     Clariti also asked for, among other things, the prosecution file histories for the patents and assignment documents showing Aspex had the right to enforce them. [Yonemoto Decl., ¶ 9, Ex. E (CLA000005, at ¶l).]

**Plaintiffs' Response**

Undisputed.

14.     On or about May 12, 2003, counsel for Aspex sent counsel for Clariti a letter in response to Clariti's March 18, 2003 letter. [Yonemoto Decl., ¶ 10, Ex. F.]

**Plaintiffs' Response**

 Undisputed.

15. The May 12, 2003 letter from Aspex's counsel to Clariti's counsel states, in part:

> Also, in response to numbered paragraph 7 of your letter, we have provided you with the following list of claims we believe cover the frames sold by your client:
> U.S. Patent No. 5,737,054: Claim 1; and
> U.S. Patent No. 6,012,811: Claims 1-4, 7, 9-14, 22-33.

[Yonemoto Decl., ¶ 10, Ex. F (CLA000007).]

**Plaintiffs' Response**

 Undisputed.

16. The May 12, 2003 letter did not identify any claim of either the '747 Patent or the '545 Patent that Aspex claimed covered the products sold by Clariti. [Yonemoto Decl., ¶ 10, Ex. F.]

**Plaintiffs' Response**

 Undisputed.

17. With the May 12, 2003 letter, Aspex included copies of the file histories for the '054 Patent and the '811 Patent. [Yonemoto Decl., ¶ 10, Ex. F.]

**Plaintiffs' Response**

 Undisputed.

18. Aspex's May 12, 2003 letter did not include file histories, assignment documents, or any other documents for the '545 or '747 Patents. [Yonemoto Decl., ¶ 10, Ex. F.]

**Plaintiffs' Response**

 Undisputed.

19. The May 12, 2003 letter did not state that the claims Aspex "believe[d] cover the frames sold by" Clariti listed in the May 12, 2003 letter were preliminary or incomplete, that Aspex's analysis was continuing or that Aspex intended to provide the requested documents and information about the '545 or '747 Patents at a later date. [Yonemoto Decl,, ¶ 10, Ex. F.]

**Plaintiffs' Response**

Disputed.  The May 12, 2003 was directed only to the '811 and '054 patents.  It stated: "We have included more than enough information for your analysis of your client's infringement *of U.S. Patent Nos. 6,012,811 and 5,737,054*" (emphasis supplied).  Plaintiff sets forth in Section IV additional specific facts showing that there is a genuine issue for trial.

20.   After receiving and reviewing Aspex's May 12, 2003 letter, Clariti concluded that Aspex had decided not to further accuse Clariti of infringing the other three patents identified in Aspex's March 7, 2003 and March 10, 2003 letters, including the '747 and '545 Patents. [Yonemoto Decl., ¶ 11.]

**Plaintiffs' Response**

Plaintiffs are without knowledge or information sufficient to make a determination as to whether the statements in this paragraph are true, and therefore dispute the same.  Plaintiff sets forth in Section IV specific facts showing that there is a genuine issue for trial.

21.   On or about June 26, 2003, counsel for Clariti sent counsel for Aspex a letter denying that Clariti infringed any of the claims identified in Aspex's May 12, 2003 letter. [Yonemoto Decl., ¶ 12, Ex. G.]

**Plaintiffs' Response**

Disputed.  Clariti did not deny infringement of at least one claim identified in the May 12, 2003 letter (claim 7 of the '811 patent).  Also disputed to the extent this statement suggests that Clariti denied infringement of any other Aspex/Contour patent.

22.   Clariti did not receive a response to the June 26, 2003 letter. Rather, the next time Clariti received any correspondence from Aspex was not until on or about August 23, 2006. [Yonemoto Decl., ¶¶ 13, 20, Ex. M.]

**Plaintiffs' Response**

Disputed to the extent Clariti contends that it did not receive a further response from Aspex.  Aspex wrote to Clariti at least by August 23, 2006.

23.     Given Aspex's lack of response to Clariti's June 26, 2003 letter, Clariti concluded that Aspex had decided not to pursue even the claims it identified in its May 12 letter, let alone the five patents it had named in its March 2003 letters. [Yonemoto Decl., ¶ 13.]

**Plaintiffs' Response**

Plaintiffs are without knowledge or information sufficient to make a determination as to whether the statements in this paragraph are true, and therefore dispute the same.  Plaintiff sets forth in Section IV specific facts showing that there is a genuine issue for trial.

24.     For 2003, Clariti's sales of AIRMAG products totaled less than $██████. [Yonemoto Decl., ¶ 14, Ex. H (2003 spreadsheet of AIRMAG sales).]

**Plaintiffs' Response**

Undisputed, assuming Clariti's revenue documents are correct.  (*See* CLA 1245-72.)

25.     Clariti's 2004 AIRMAG sales totaled $██████. [Yonemoto Decl., ¶ 15(a), Ex. I (2004 spreadsheet of AIRMAG sales).]

**Plaintiffs' Response**

Undisputed, assuming Clariti's revenue documents are correct.  (*See* CLA 1245-72.)

26.     Clariti's 2005 AIRMAG sales totaled $██████. [Yonemoto Decl, ¶ 15(b), Ex. J (2005 spreadsheet of AIRMAG sales).]

**Plaintiffs' Response**

Undisputed, assuming Clariti's revenue documents are correct.  (*See* CLA 1245-72.)

27.     Clariti's AIRMAG sales for 2006 totaled $██████. [Yonemoto Decl., ¶ 15(c), Ex. K (2006 spreadsheet of AIRMAG sales).]

**Plaintiffs' Response**

Undisputed, assuming Clariti's revenue documents are correct.  (*See* CLA 1245-72.)

28.     In 2004, Clariti applied for and received a federal trademark registration for AIRMAG. [Yonemoto Decl., ¶¶ 3-4, Ex. A; ¶ 24, Ex. P.]

**Plaintiffs' Response**

Undisputed.

29.     From 2004-2007, Clariti attended the International Vision Expo twice each year. [Yonemoto Decl., ¶ 17.]

**Plaintiffs' Response**

Plaintiffs are without knowledge or information sufficient to make a determination as to whether the statements in this paragraph are true, and therefore dispute the same.  Further disputed to the extent Clariti suggests that it only first started attending the Vision expo in 2004. Plaintiff sets forth in Section IV specific facts showing that there is a genuine issue for trial.

30.     Clariti spent approximately $ ▉▉▉▉ each year on booths and marketing materials at the International Vision Expo shows, and approximately ▉% of those resources and expenditures were devoted to promoting the AIRMAG line at those shows. [Yonemoto Decl., ¶ 17.]

**Plaintiffs' Response**

Plaintiffs are without knowledge or information sufficient to make a determination as to whether the statements in this paragraph are true, and therefore dispute the same.

31.     From 2003, in part due to the increased sales and success of AIRMAG, ▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉. [Yonemoto Decl., ¶ 18.]

**Plaintiffs' Response**

Plaintiffs are without knowledge or information sufficient to make a determination as to whether the statements in this paragraph are true, and therefore dispute the same.

32.     In 2003 Clariti had a sales force of ▉. [Yonemoto Decl., ¶ 18.]

**Plaintiffs' Response**

Plaintiffs are without knowledge or information sufficient to make a determination as to whether the statements in this paragraph are true, and therefore dispute the same.

33.     In 2004, Clariti's sales force grew to ▉. [Yonemoto Decl., ¶ 18.]

**Plaintiffs' Response**

Plaintiffs are without knowledge or information sufficient to make a determination as to whether the statements in this paragraph are true, and therefore dispute the same.

34.   At the end of 2006, Clariti had a sales force of ■ people. [Yonemoto Decl., ¶ 18.]

**Plaintiffs' Response**

Plaintiffs are without knowledge or information sufficient to make a determination as to whether the statements in this paragraph are true, and therefore dispute the same.

35.   In March 2007, Clariti moved to a new, larger and more expensive location, again in part to address space and infrastructure needs occasioned by its successful AIRMAG sales. [Yonemoto Decl., 1 ¶ 19.]

**Plaintiffs' Response**

Plaintiffs are without knowledge or information sufficient to make a determination as to whether the statements in this paragraph are true, and therefore dispute the same.

36.   As part of this move, Clariti spent approximately $■■■■ in relocation expenses (e.g., moving expenses, building improvements, carpet, and alarm / security). [Yonemoto Decl., ¶ 19, Ex. L.]

**Plaintiffs' Response**

Plaintiffs are without knowledge or information sufficient to make a determination as to whether the statements in this paragraph are true, and therefore dispute the same.

37.   Moreover, the new facilities are more expensive than the prior facilities; Clariti spends approximately $■■■■■ dollars a month in increased monthly overhead (e.g., additional mortgage, taxes, additional electricity, water, trash pickup, and other utilities) as a result of moving to the new space. [Yonemoto Decl., ¶ 19.]

**Plaintiffs' Response**

Plaintiffs are without knowledge or information sufficient to make a determination as to whether the statements in this paragraph are true, and therefore dispute the same.

38.   Towards the end of August 2006, Clariti received a letter from Aspex dated August 23, 2006, again accusing Clariti of infringing the '747 Patent. [Yonemoto Decl., ¶ 20, Ex. M.]

**Plaintiffs' Response**

Undisputed to the extent that counsel for Aspex sent Clariti a letter on or about August 23, 2006 charging Clariti's AirMag products of infringement of the '747 Patent.

39.    On or about October 20, 2006, counsel for Aspex sent counsel for Clariti a letter, which (in part) again accused Clariti of infringing the '545 Patent. [Yonemoto Decl., ¶ 21, Ex. N.]

**Plaintiffs' Response**

Undisputed to the extent that counsel for Aspex sent Clariti a letter on or about October 20, 2006 charging Clariti's AirMag products of infringement of the '545 Patent.

40.    On or about November 9, 2006, counsel for Clariti sent counsel for Aspex a letter, in which Clariti took the position that it did not infringe the patents and also that Aspex's claims were barred by Aspex's conduct. [Yonemoto Decl., ¶ 22, Ex. O.]

**Plaintiffs' Response**

Undisputed.

41.    Clariti did not receive any further correspondence from Aspex or its counsel in response to the November 9, 2006 letter, until Clariti was served with Aspex's complaint in this action towards the end of March 2007. [Yonemoto Decl., ¶ 22.]

**Plaintiffs' Response**

Undisputed.

42.    In September 2007, a long-time employee of Clariti, Mr. Chung Y. Suh, passed away. Mr. Suh was the warehouse manager for Clariti for 14 years, and was very familiar with the products that Clariti received and sold, including the AIRMAG products. [Yonemoto Decl., ¶ 23.]

**Plaintiffs' Response**

Plaintiffs are without knowledge or information sufficient to make a determination as to whether the statements in this paragraph are true, and therefore dispute the same.

II.     **PLAINTIFFS RESPONSE TO CLARITI'S UNDISPUTED MATERIAL
        FACTS DEMONSTRATING THAT EACH OF THE CLAIMS OF
        THE ASSERTED PATENTS IS INVALID AS A MATTER OF LAW.**

        43.     Through this action, Plaintiffs accuse Clariti of infringing two patents: U.S. Patent
No. 6,109,747 ("the '747 Patent"), and U.S. Patent No. RE37,545 ("the '545 Patent").
[Plaintiffs' Complaint, ¶¶ 12, 21.]

**Plaintiffs' Response**

        Undisputed.

        44.     The application that led to the '747 Patent was filed on April 28, 1997 and the '747
Patent was issued on August 29, 2000.

**Plaintiffs' Response**

        Undisputed.

        45.     The application that ultimately led to the '545 Patent was filed on November 7,
1997 and the '545 Patent was issued on February 12, 2002.

**Plaintiffs' Response**

        Undisputed.

        46.     In response to discovery requests by Clariti, asking Plaintiffs to identify each
claim of the '747 Patent that they contend Clariti infringes, Plaintiffs have identified two
claims:  claim 10 and claim 12. [Declaration of Andrew D. Skale in Support of Clariti's Motion
for Summary Judgment ("Skale Decl."), ¶ 3, Ex. Q (Plaintiffs' responses to Clariti's first set of
interrogatories (nos. 1-10), response to interrogatory no. 1, and claim chart also attached at
Skale Decl., Ex. Q.]

**Plaintiffs' Response**

        Undisputed.

        47.     In response to discovery requests by Clariti, asking Plaintiffs to identify each
claim of the '545 Patent that they contend Clariti infringes, Plaintiffs have identified only one
claim: claim 23. [Skale Decl., ¶ 3, Ex. Q.]

**Plaintiffs' Response**

        Undisputed.

        48.     On September 13, 2007, Clariti filed a request for reexamination of the '545.
Patent with the PTO, which included a request to reexamine (among others) claim 23. [Skale

Decl., ¶ 4, Ex. R (Clariti's Request for Reexamination of U.S. Patent No. RE 37,545 and accompanying exhibits).]

**Plaintiffs' Response**

Undisputed.

49.    In its September 13, 2007 request for reexamination, Clariti identified the following prior art references and requested that claim 23 (and other claims) be reexamined in light of the following references and 35 U.S.C. § 103:

(a)    U.S. Patent No. 5,867,244, filed on August 3, 1995, issued to Martin ("Martin") [Skale Decl., ¶ 4, Ex. R (Martin is attached as Exhibit D to the request for reexamination that is Ex. R)];

(b)    U.S. Patent No. 5,642,177, filed on December 9, 1994, issued to Nishioka ("Nishioka") [Skale Decl., ¶ 4, Ex. R (Nishioka is attached as Exhibit E to the request for reexamination that is Ex. R)]; and

(c)    U.S. Patent No. 5,416,537, filed on March 22, 1994, issued to Sadler ("Sadler") [Skale Decl., ¶ 4, Ex. R (Sadler is attached as Exhibit F to the request for reexamination that is Ex. R).]

**Plaintiffs' Response**

Disputed to the extent that this statement suggests that Martin is a "prior art" reference.

Martin is not prior art.  Plaintiff sets forth in Section IV specific facts showing that there is a

genuine issue for trial.

50.    Also on September 13, 2007, Clariti filed a request for reexamination of the '747 Patent, including (among other claims) claims 10 and 12. [Skale Decl, ¶ 5, Ex. S (Clariti's Request for Reexamination of U.S. Patent No. 6,109,747, and accompanying exhibits).]

**Plaintiffs' Response**

Undisputed.

51.    In its September 13, 2007 request for reexamination, Clariti requested that claims 10 and 12 (and other claims) of the '747 Patent be reexamined in light of 35 U.S.C. § 102 and/or 35 U.S.C. § 103, in light of the following references:

(a)    Japanese Published Patent Application No. JP 09101489A, filed May 31, 1995 by T. Iwamoto ("Iwamoto") [Skale Decl, ¶ 5, Ex. S (Iwamoto is attached as Exhibit D to the request for reexamination that is Ex. S)]; and

(b)    U.S. Patent No. 6,149,269 issued November 21, 2000 to Julie B.

Madison ("Madison") [Skale Decl., ¶ 5, Ex. S (Madison is attached as Exhibit E to the request for reexamination that is Ex. S).]

**Plaintiffs' Response**

Undisputed.

52.   On October 23, 2007, the PTO issued an order granting Clariti's request for reexamination of claims 1-3, 10 and 12 of the '747 Patent. [Skale Decl., ¶ 6, Ex. T (PTO October 23, 2007 "Order Granting Request for Ex Parte Reexamination").]

**Plaintiffs' Response**

Undisputed.

53.   The PTO's order granting Clariti's request for reexamination of the claims 1-3, 10 and 12 of the '747 Patent states (in part): "A substantial new question of patentability affecting claims 1-3, 10 and 12 of United States Patent Number 6,109,747 ("the '747 Patent") is raised by the request for ex parte reexamination." [Skale Decl., ¶ 6, Ex. T, at p. 2.]

**Plaintiffs' Response**

Undisputed.

54.   The PTO's order granting Clariti's request for reexamination of claims 1-3, 10 and 12 of the '747 Patent also states (in part)::

> (1) It is agreed that the consideration of Iwamoto raises a substantial new question of patentability to claims 1-3, 10 and 12 of the '747 patent. As pointed out on pages 9-13 of the request, Iwamoto discloses an eyeglass combination comprising a primary frame 10 (Fig. 1) and an auxiliary frame 40 (Fig. 4). The primary frame includes bridge 23 (Fig. 1) and two sides each having a stud 24 (Fig. 1). The auxiliary frame includes a second bridge 41 (Fig. 4) and two sides 42 (Fig. 4) each having an extension 42 (Fig. 4) extended rearward toward the primary frame and extended over the studs 24 (Fig. 6). The extensions each includes a rear end 42a (Fig. 6) having a first flange (stopper 74b in Figs. 11, 12) extended downward. The studs of the primary frame and the extending flanges of the auxiliary frame each include a magnet for securing the auxiliary frame to the primary frame (Figs. 6-10). There is a substantial likelihood that a reasonable examiner would consider the Iwamoto reference, which is newly cited prior art, important in making a decision as to the patentability of at least some of the claims of the '747 patent because the Iwamoto reference is directed to the same field of using magnets to couple the removable frame to the eyeglass frame and discloses numerous claimed limitations. Accordingly, the Iwamoto reference raise a substantial new question of patentability with respect to

at least the claims noted above, which question has not been decided in a previous examination of the '747 patent.

(2) It is agreed that the consideration of Madison raises a substantial new question of patentability to claims 1-3, 10 and 12 of the '747 patent. As pointed out on pages 13-17 of the request, Madison discloses an eyeglass combination (col. 6, lines 22-23) comprising a primary frame (Figs. 35-38) and an auxiliary frame (a clip-on 60 in Fig. 16). The primary frame includes bridge 56 (Fig. 8) and two sides each having a stud (uniblock 10 in Figs. 14-15). The auxiliary frame (the clip-on 60) has a magnet 14' supported by an arm 58 (extension) forming part of a uniblock 10' attached to the auxiliary lens 16 (col. 6, lines 23-25). The express notation that the clip-on 60 has a magnet 14' supported by an arm 58 implies that the arm itself is not a magnet (col. 6, lines 26-27). The magnetic housings for the two uniblocks 10, 10' are shaped so that each magnet is oriented with its axis horizontal. There is a substantial likelihood that a reasonable examiner would consider the Madison reference, which is newly cited prior art, important in making a decision as to the patentability of at least some of the claims of the '747 patent because the Madison reference is directed to the same field of using magnets to couple the removable frame to the eyeglass frame and discloses numerous claimed limitations. Accordingly, the Madison reference raise a substantial new question of patentability with respect to at least the claims noted above, which question has not been decided in a previous examination of the '747 patent.

(3) It is agreed that the Madison and/or Iwamoto references raise a substantial new question of patentability with regard to claims 1-3, 10 and 12 of the '747 patent. There is a substantial likelihood that a reasonable examiner would consider the Madison and/or Iwamoto references, which are newly cited prior art, important in making a decision as to the patentability of at least some of the claims of the '747 patent because the references are directed to the same field of using magnets to couple the removable frame to the eyeglass frame and discloses much of the instant claimed limitations. Accordingly, the references raise a substantial new question of patentability with respect to at least the claims noted above, which question has not been decided in a previous examination of the '747 patent.

[Skale Dec1., ¶ 6, Ex. T, at pp. 4-5.]

**Plaintiffs' Response**

Undisputed.

55.    Plaintiff Contour has since filed a response to the PTO's reexamination order regarding the '747 Patent. On February 26, 2008, Clariti filed a reply with the PTO. [Skale . Decl., ¶ 9, Ex. W.]

**Plaintiffs' Response**

Undisputed.

56.    On November 28, 2007, the PTO issued an order granting Clariti's request for reexamination of claims 1-9, 12-13, 16-20, 23-24 and 31-34 of the '545 Patent. [Skale Decl., ¶ 7, Ex. U (PTO November 28, 2007 "Order Granting Request for Ex Parte Reexamination").]

**Plaintiffs' Response**

Undisputed.

57.    The PTO's order granting Clariti's request for reexamination of claims 1-9, 12-13, 16-20, 23-24 and 31-34 of the '545 Patent states (in part):

> A substantial new question of patentability affecting claims 1-9, 12-13, 16-20,23-24, and 31-34 of United States Patent Number RE 37,545 is raised by the request for *ex parte* reexamination.
>
> The examiner considers a substantial new question of patentability has been raised by at least certain of the following prior art references:
>
>> Patent 5,867,244 issued to Martin ("Martin")
>> Patent 5,642,177 issued to Nishioka ("Nishioka")
>> Patent 5,416,537 issued to Sadler ("Sadler")
>
> …
>
> ….[I]t is <u>agreed</u> that the *Martin* reference, taken in view of *Nishioka* and/or *Sadler,* raises a substantial new question of patentability regarding at least claims 1-9, 12-13, 16-20, 23-24, and 31-34 by obviousness. *Martin* was filed on August 3,1995, which predates the filing of the '545 patent on November 7, 1995. The *Martin* reference was not before the Examiner at the time of examination. Similarly, the *Sadler* reference was not before the examiner at the time of examination. While the *Nishioka* reference was before the examiner at the time of examination, it now being viewed in a new light based on its combination with the *Martin* reference.

[Skale Decl., ¶ 7, Ex. U, at pp. 2, 6.]

**Plaintiffs' Response**

Undisputed.

58.   Plaintiffs have not filed any response to the PTO's November 28, 2007 order granting Clariti's request for reexamination of claims 1-9, 12-13, 16-20, 23-24 and 31-34 of the '545 Patent. [Skale Decl., ¶ 10.]

**Plaintiffs' Response**

Undisputed.

**III.    PLAINTIFFS RESPONSE TO CLARITI'S UNDISPUTED MATERIAL FACTS DEMONSTRATING THAT PLAINTIFFS' '747 PATENT IS INVALID AND UNENFORCEABLE DUE TO PLAINTIFFS' INEQUITABLE CONDUCT.**

59.   Through this action, Plaintiffs accuse Clariti of infringing two patents, one of which is U.S. Patent No. 6,109,747 ("the '747 Patent") [Plaintiffs' Complaint, ¶¶ 12, 21.]

**Plaintiffs' Response**

Undisputed.

60.   The application that led to the '747 Patent was filed on April 28, 1997 and the '747 Patent was issued on August 29, 2000. [Skale Decl., ¶ 5, Ex. S (Clariti's Request for Reexamination of U.S. Patent No. 6,109,747, and accompanying exhibits) (the '747 Patent is attached as Exhibit A to the Reexamination request that is Exhibit S).]

**Plaintiffs' Response**

Undisputed.

61.   The named inventor of the '747 Patent is David Yinkai Chao. [Skale Decl, ¶ 5, Ex. S (the '747 Patent is attached as Exhibit A to the Reexamination request that is Exhibit S).]

**Plaintiffs' Response**

Undisputed.

62.   The application for United States Patent No. 6,149,269, entitled "Eyeglasses Having Magnetically Held Auxiliary Lenses," (hereinafter "Madison Application") was filed on April 18, 1997. [Skale Decl., ¶ 5, Ex. S (the '269 Patent is attached as Exhibit E to the Reexamination request that is Exhibit S).]

**Plaintiffs' Response**

Undisputed.

63.   David Yinkai Chao was aware at least as early as 1997 that the Madison Application had been filed with the PTO. [Skale Decl., ¶ 11, Ex. X, at 231:14-238:13 (Excerpt from certified transcript of September 4, 2003 deposition of David Chao, in *Aspex Eyewear,*

*Inc. et al. v. Miracle Optics, Inc.,* No. CV 01-10396 (United States District Court, Central District of California).]

**Plaintiffs' Response**

      Disputed.  Plaintiff sets forth in Section IV specific facts showing that there is a genuine issue for trial.

      64.    During his September 4, 2003 deposition, David Chao testified (in part) regarding the Madison Application:

> Q:    And when did you become aware that she [Julie Madison] had filed this patent application?
>
> A:    In the late part of 1996 or beginning of 1997 I informed Julie Madison and Ira Lerner that I was going to supply this product to Chic Optic and they told me that I cannot do it because they have filed a patent application on it.
>
> Q:    Okay. And what did you do?
>
> A:    I was very upset.
>
> Q:    And what did you do about it?
>
> A:    I was very upset and alert and I come to the realization that although I believe that the '207 patent was broad enough to cover many things, if I do not file patent applications on certain specific embodiments Julie Madison may end up stopping Contour from making product of certain specific -- of certain embodiments.
>
> Q:    And so is that when you decided to file your own patent applications on certain designs?
>
> A:    Yes.

[Skale Decl., ¶ 11, Ex. X, at 237:19-238:13.]

**Plaintiffs' Response**

      Undisputed that this is a portion of the testimony of Mr. Chao, but disputed that the testimony of David Chao is complete regarding these issues.  Plaintiff sets forth in Section IV specific facts showing that there is a genuine issue for trial.

65.   During his September 4, 2003 deposition, David Chao testified (in part) regarding the '269 Patent:

> Q:     Do you know who owns the Julie Madison Patent?
>
> A:     I think Manhattan Design Studio.

[Skale Decl., ¶ 11, Ex. X, at 232:9-11.]

**Plaintiffs' Response**

Undisputed that this is a portion of the testimony of Mr. Chao, but disputed that the testimony of David Chao is complete regarding these issues.  Plaintiff sets forth in Section IV specific facts showing that there is a genuine issue for trial.

66.   During his September 4, 2003 deposition, David Chao testified (in part) regarding the business relationship between Contour and Manhattan Design Studio:

> Q:     Did Contour make a monoblock or uniblock?
>
> A:     Yes.
>
> Q:     And did it sell it?
>
> A:     Yes.
>
> Q:     To who?
>
> A:     To Manhattan Design Studio and others.
>
> Q:.    And did it have any agreement with Manhattan Design Studio at that time to exclusively distribute its products through Manhattan Design Studio?
>
> A:     Only in the United States.

[Skale Decl., ¶ 11, Ex. X, at 241:15-24.]

**Plaintiffs' Response**

Undisputed that this is a portion of the testimony of Mr. Chao, but disputed that the testimony of David Chao is complete regarding these issues.  Plaintiff sets forth in Section IV specific facts showing that there is a genuine issue for trial.

67.     During his September 4, 2003 deposition, David Chao also testified (in part) regarding the business relationship between Contour and Manhattan Design Studio:

> Q:      And did you enter into an agreement with Manhattan Design Studio to make them your exclusive agent?
>
> A:      The agreement was reached in September of 1996.
>
> Q:      And that was executed as between you and Manhattan Design Studio; you, Contour and Manhattan Design Studio?
>
> A:      Correct.
>
> Q:      And what was the subject of that agreement?
>
> A:      There were two agreements. One is a distribution agreement and another is the license agreement.

[Skale Decl., ¶ 11, Ex. X, at 261:8-20.]

**Plaintiffs' Response**

Undisputed that this is a portion of the testimony of Mr. Chao, but disputed that the testimony of David Chao is complete regarding these issues.  Plaintiff sets forth in Section IV specific facts showing that there is a genuine issue for trial.

68.     Plaintiff Aspex Eyewear, Inc. acquired the rights to the Madison Application when it purchased the assets and liabilities of Manhattan Design Studio. [Skale Decl., ¶ 12, Ex. Y at 54:14-55:5 (Excerpt from certified transcript of November 7, 2003 deposition of Thierry Ifergan, in *Aspex Eyewear, Inc. et al. v. Miracle Optics, Inc.,* No. CV 01-10396 (United States District Court, Eastern District of Pennsylvania).]

**Plaintiffs' Response**

Undisputed.

69.     Plaintiff Aspex Eyewear, Inc. purchased the assets and liabilities of Manhattan Design Studio on February 8, 2000. [Skale Decl., ¶ 12, Ex. Y at 62:16-25.]

**Plaintiffs' Response**

Undisputed.

70.     During the prosecution of the application that led to the issuance of the '747 Patent, at no time did David Yinkai Chao or Plaintiff Contour Optic, Inc. disclose to the PTO

that the Madison Application had been filed with or was pending with the PTO. [Skale Decl., ¶ 5, Ex. S) (the '747 Patent is attached as Exhibit A to the Reexamination request that is Exhibit S).]

**Plaintiffs' Response**

Disputed to the extent this statement presumes:  that Mr. Chao had specific knowledge of whether Ms. Madison had actually filed an application with the Patent Office; that Mr. Chao had a copy of the Madison Application; the Mr. Chao knew any of its contents; or that Mr. Chao knew of its serial number.  Clariti has not demonstrated any of these facts.  Plaintiff sets forth in Section IV specific facts showing that there is a genuine issue for trial.

71.     The Madison Application was not reviewed by the PTO during the prosecution of the application that led to the issuance of the '747 Patent. [Skale Decl., ¶ 5, Ex. S) (the '747 Patent is attached as Exhibit A to the Reexamination request that is Exhibit S).]

**Plaintiffs' Response**

Undisputed.

72.     On September 13, 2007, Clariti filed a request for reexamination of the '747 Patent, including (among other claims) claims 10 and 12. [Skale Decl., ¶ 5, Ex. S.]

**Plaintiffs' Response**

Undisputed.

73.     In its September 17, 2003 request for reexamination, Clariti requested that claims 10 and 12 (and other claims) of the '747 Patent be reexamined in light of 35 U.S.C. § 102 and/or 35 U.S.C. § 103, in light of the following references:

(a)     Japanese Published Patent Application No. JP 09101489A, filed May 31, 1995 by T. Iwamoto ("Iwamoto") [Skale Decl., ¶ 5, Ex. S (Iwamoto is attached as Exhibit D to the request for reexamination that is Ex. S)]; and

(b)     U.S. Patent No. 6,149,269 issued November 21, 2000 to Julie B. Madison ("Madison") [Skale Decl., ¶ 5, Ex. S (Madison is attached as Exhibit E to the request for reexamination that is Ex. S).]

**Plaintiffs' Response**

Undisputed.

74.     On October 23, 2007, the PTO issued an order granting Clariti's request for reexamination of claims 1-3, 10 and 12 of the '747 Patent. [Skale Decl., ¶ 6, Ex. T (PTO October 23, 2007 "Order Granting Request for Ex Parte Reexamination").]

**Plaintiffs' Response**

     Undisputed.

75.     The PTO's order granting Clariti's request for reexamination of the claims 1-3, 10 and 12 of the '747 Patent states (in part): "A substantial new question of patentability affecting claims 1-3, 10 and 12 of United States Patent Number 6,109,747 ("the '747 Patent") is raised by the request for ex parte reexamination." [Skale Decl., ¶ 6, Ex. T, at p. 2.]

**Plaintiffs' Response**

     Undisputed.

76.     With respect to the '269 Patent, the PTO's order granting Clariti's request for reexamination of claims 1-3, 10 and 12 of the '747 Patent also states (in part):

> (2) It is agreed that the consideration of Madison raises a substantial new question of patentability to claims 1-3, 10 and 12 of the '747 patent. As pointed out on pages 13-17 of the request, Madison discloses an eyeglass combination (col. 6, lines 22-23) comprising a primary frame (Figs. 35-38) and an auxiliary frame (a clip-on 60 in Fig. 16). The primary frame includes bridge 56 (Fig. 8) and two sides each having a stud (uniblock 10 in Figs. 14-15). The auxiliary frame (the clip-on 60) has a magnet 14' supported by an arm 58 (extension) forming part of a uniblock 10' attached to the auxiliary lens 16 (col. 6, lines 23-25). The express notation that the clip-on 60 has a magnet 14' supported by an arm 58 implies that the arm itself is not a magnet (col. 6, lines 26-27). The magnetic housings for the two unblocks 10, 10' are shaped so that each magnet is oriented with its axis horizontal. There is a substantial likelihood that a reasonable examiner would consider the Madison reference, which is newly cited prior art, important in making a decision as to the patentability of at least some of the claims of the '747 patent because the Madison reference is directed to the same field of using magnets to couple the removable frame to the eyeglass frame and discloses numerous claimed limitations. Accordingly, the Madison reference raise a substantial new question of patentability with respect to at least the claims noted above, which question has not been decided in a previous examination of the '747 patent.
>
> (3) It is agreed that the Madison and/or Iwamoto references raise a substantial new question of patentability with regard to claims 1-3,

10 and 12 of the '747 patent. There is a substantial likelihood that a reasonable examiner would consider the Madison and/or Iwamoto references, which are newly cited prior art, important in making a decision as to the patentability of at least some of the claims of the '747 patent because the references are directed to the same field of using magnets to couple the removable frame to the eyeglass frame and discloses much of the instant claimed limitations. Accordingly, the references raise a substantial new question of patentability with respect to at least the claims noted above, which question has not been decided in a previous examination of the '747 patent.

[Skale Decl., ¶ 6, Ex. T, at pp. 4-5.]

**Plaintiffs' Response**

Undisputed.

## IV.   PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXISTS A GENUINE ISSUE OR WHICH ARE NOT GENUINELY DISPUTED BUT PRECLUDE SUMMARY JUDGMENT IN CLARITI'S FAVOR.

1.     In 1999, Aspex sued Clariti for infringement of plaintiffs' '207 Patent. (Faegenburg Decl. Exh. C, Consent Judgment ¶¶ 3-6, Oct. 6, 1999.)

2.     Plaintiffs' suit against Clariti was resolved on or around October 6, 1999, with a consent judgment in which Clariti acknowledged infringement of the '207 patent and agreed to cease infringing sales.  (Faegenburg Decl. Exh. C, Consent Judgment ¶¶ 3-6, Oct. 6, 1999.)

3.     On or about March 7, 2003, counsel for Aspex wrote a letter to counsel for Clariti that provided notice to Clariti of Aspex rights in the '545 Patent, U.S. Patent Nos. 5,737,054 ("the '054 Patent"), 6,012,811 ("the '811 Patent"), 6,092,896 ("the '896 Patent"). (Yonemoto Decl., Exh. C)

4.     The March 7, 2003 letter stated that "some of the products sold by you may be covered by the claims of the above mentioned patents."  (Skale Decl., Exh. C).

5.     The March 7, 2003 letter was an invitation for "a prompt and reasonable resolution."  (Yonemoto Decl., Exh. C)

6.     The March 7, 2003 letter did not threaten an immediate suit for infringement. (Yonemoto Decl., Exh. C)

7.     On or about March 10, 2003, counsel for Aspex wrote a letter to counsel for Clariti that provided notice to Clariti of Aspex rights in the '747 Patent. (Yonemoto Decl., Exh. D)

8.     The March 10, 2003 letter stated that "some of the products sold by you may be covered by the claims of the above mentioned patents."  (Yonemoto Decl., Exh. D).

9.     The March 7, 2003 letter was an invitation for "a prompt and reasonable resolution."  (Yonemoto Decl., Exh. D)

10.    The March 7, 2003 letter did not threaten an immediate suit for infringement. (Yonemoto Decl., Exh. D)

11.    Aspex did not state in its May 12, 2003 letter to Clariti that Aspex was abandoning infringement allegations with respect to the '747 Patent.  (Yonemoto Decl., Exh. F)

12.    Aspex did not state in the May 12, 2003 letter to Clariti that it was abandoning infringement allegations with respect to the '545 Patent.  (Yonemoto Decl., Exh. F)

13.    Aspex never told Clariti that it did not infringe the '747 Patent.  (Faegenburg Decl. Exh. O at 102:7-20)

14.    Aspex never told Clariti that it would not enforce the '545 Patent.  (Faegenburg Decl. Exh. O at 102:7-20)

15.    Aspex never told Clariti that it did not infringe the '747 Patent.  (Faegenburg Decl. Exh. O at 102:7-20)

16.    Aspex never told Clariti that it would not enforce the '545 Patent.  (Faegenburg Decl. Exh. O at 102:7-20)

17.    From 2003 to August 2006, Aspex did not receive any communication from or on behalf of Clariti denying infringement of any of the claims of the '747 patent.

18.    From 2003 to August 2006, Aspex did not receive any communication from or on behalf of Clariti denying infringement of any of the claims of the '545 patent.

19.    Aspex reiterated its charge of infringement by the AirMag eyeglasses in August and October 2006.  (Yonemoto Decl., Exh. M; Faegenburg Decl. Exh. H.)

20.    Counsel for Aspex explained in an October 20, 2006 letter to counsel for Clariti that it believed that Clariti had previously agreed to cease marketing of infringing designs. (Faegenburg Decl. Exh. H.)

21.     Aspex did not engage in any misleading conduct with respect to its enforcement of the '747 or '545 Patents.

22.     Clariti did not rely on any supposed misleading conduct of Aspex in proceeding with its AirMag products.

23.     Clariti has no e-mails, memoranda or other evidence from 2003 to 2006 to establish that it proceeded with AirMag because it believed that the '747 and '545 Patents would not be enforced.

24.     Clariti pursued the AirMag product line based on a business judgment that the product would be profitable.

25.     Clariti was forced to cease selling infringing magnetic clip-on eyewear in 1999, after Aspex sued on the '207 Patent.

26.     Clariti made a decision by February 2003 to market AirMag and understood there was a market for such a product.

27.     Clariti did not incur any material prejudice in reliance on any supposed misleading conduct of Aspex.

28.     After learning of the '747 and '545 Patents, Clariti did not conduct an investigation of possible infringement of those patents.  (Faegenburg Decl. Exh. O at 77:13-24, 79:11-13, 83:9-17, 93:6-12, 95:5-10.)

29.     After learning of the '747 and '545 Patents, Clariti did not change its product design, ask its supplier to do so or stop selling the product.

30.     Clariti has not produced any evidence that it obtained competent advice of an attorney from 2003 to 2006 regarding any possible defense of noninfringement, invalidity or unenforceability as to the '747 and '545 Patents.  (*Id.* 95:5-10.)

31.     Even after Aspex reiterated its infringement charges in 2006, Clariti continued to sell the AirMag.  (Faegenburg Decl. Exh. F at CLA 1255-72.)

32.     Clariti sought to expand the AirMag business in 2007.  (Faegenburg Decl. Exh. P; Clariti Br. 6.)

33.     Not until 2006, by which time Clariti had been marketing AirMags for more than three years, did Clariti receive any opinion of counsel of noninfringement, invalidity or unenforceability of either the '747 or '545 Patents.  (Faegenburg Decl. Exh. Q.)

34.     Clariti does not manufacture AirMag.  (Faegenburg Decl. Exh. O at 113:3-25.)

35.     Clariti does not, and has not, developed manufacturing facilities for the AirMag, has not purchased any tooling or machinery for that product and has not invested in any testing or quality control equipment.

36.     Clariti's only role is in marketing the AirMag products, and its expenditures have been modest and not in reliance on Aspex's conduct.  (Faegenburg Decl. Exh. O at 113:3-25; Clariti Br. 5-7.)

37.     Clariti attended the International Vision Expo prior to 2004.

38.     Clariti did not start attending the Vision Expo *because* of Aspex's communications or specifically for AirMag.

39.     Clariti's presence at the Vision Expo from 2004-2007 was for its business *as a whole*, not simply for the AirMag line.

40.     Clariti's increase in sales force from 2003 to 2006 was due to the growth of its entire business, not specifically because of the AirMag product line.  (Clariti Br. 6.)

41.     Clariti moved to a new facility in March 2007, *after* Aspex's August and October 2006 letters to Clariti.

42.     The Patent Office orders granting reexaminations of the '747 and '545 Patents did not find any claim to be invalid.

43.     Iwamoto lacks certain elements of claims 10 and 12 of the '747 Patent.

44.     Madison lacks certain elements of claims 10 and 12 of the '747 Patent.

45.     Iwamoto does not teach lateral engagement between magnetic materials in the primary frame and the auxiliary frame, as required by claims 10 and 12 of the '747 Patent.

46.     Iwamoto does not teach flanges on auxiliary frames that are not themselves magnets, but that include magnetic material, as required by claims 10 and 12 of the '747 Patent.

47.     The Madison Patent does not teach flanges extending downward on auxiliary frames that are not themselves magnets, but that include magnetic material, as required by claims 10 and 12 of the '747 Patent.

48.     The Madison Patent does not teach extensions on the auxiliary frame that are supported by studs on the primary frame to prevent the auxiliary frame from moving downward relative to the primary frame, as required by claims 10 and 12 of the '747 Patent.

49.     The Madison Patent does not teach flanges on the auxiliary frame located behind the studs of the primary frame to further secure the auxiliary frame to the primary frame, as required by claims 10 and 12 of the '747 Patent.

50.     There was no reason to combine the Madison patent and Iwamoto in the manner claimed in claims 10 and 12 of the '747 Patent.

51.     Iwamoto explicitly teaches away from a horizontal orientation of magnetic poles in magnetic materials in an auxiliary and primary frame.

52.     Designs sold under the '747 Patent have achieved substantial commercial success. (Ifergan Decl. ¶ 3.)

53.    Designs sold under the '747 Patent have been accorded significant respect and acquiescence in the eyewear industry.  (Ifergan Decl. ¶ 4.)

54.    Richard Chao invented the subject matter of the '545 patent prior to the filing date of the Martin reference.  (Faegenburg Decl. Exh. S.)

55.    Nishioka and Sadler were considered by the examiner during the examination of the '545 Patent.

56.    David Chao did not have a copy of the Madison Application at any time during prosecution of the '747 Patent.  (Faegenburg Decl. Exh. T, Chao Decl. ¶ 15, Sept. 22, 2003.)

57.    David Chao did not know of the specific contents of the Madison Application at any time during prosecution of the '747 Patent.

58.    David Chao did not have the serial number for Madison's application any time during prosecution of the '747 Patent.

59.    The Madison Patent and Madison Application did not become publicly available until November 21, 2000, *after* the '747 Patent issued.

Respectfully submitted,

LERNER, DAVID, LITTENBERG,
 KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090-1497
Tel:    908.654.5000
Fax:    908.654.7866

Dated: May 1, 2008

By:    s/  Russell W. Faegenburg
        Russell W. Faegenburg
        Tel:    908.654.5000
        E-mail: rfaegenburg@ldlkm.com
            litigation@ldlkm.com
*Attorneys for Plaintiffs Aspex*
Eyewear, Inc. and Contour Optik, Inc.